2020 IL App (1st) 18-1067-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
August 11, 2020

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the Circuit Court of |
| Respondent-Appellee, | ) | Cook County, Illinois, |
| | ) | Criminal Division. |
| v. | ) | |
| | ) | No. 92 CR 13103 01 |
| PATRICIA OUSKA, | ) | |
| | ) | The Honorable |
| Petitioner-Appellant. | ) | William H. Hooks, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Pucinski and Coghlan concurred in the judgment.

**ORDER**

¶ 1 *Held*: The trial court's *sua sponte* dismissal of the petition for relief from judgment (735 ILCS 5/2-1401 (West 2018)) on the basis of timeliness was improper where the State never filed a responsive pleading arguing that the petition was untimely. Dismissal on the merits was improper where the petition was filed after the effective date of the amended Code (see 735 ILCS 5/2-1401 (West 2016)) and the retroactivity of the amendment to the Uniform Code of Corrections adding domestic abuse as a statutory mitigating factor at sentencing (730 ILCS 5/5-5-3.1(a)(15) (West 2016)) had no bearing on the petitioner's claim.

¶ 2 The petitioner, Patricia Ouska, appeals from the *sua sponte* dismissal of her petition for relief from judgment (735 ILCS 5/2-1401 (West 2018)). On appeal, she contends that the trial court erred when it *sua sponte* dismissed her petition as untimely where the State never raised

timeliness in the trial court. In addition, she contends that she sufficiently alleged all the elements necessary for a meritorious claim under section 2-1401(b-5) of the Code of Civil Procedure (735 ILCS 5/2-1401(b-5) (West 2016)). For the reasons that follow, we reverse and remand.

¶ 3                                    I. BACKGROUND

¶ 4        The underlying facts of this case are undisputed. In 1992, the petitioner was charged by indictment with murder and armed robbery in connection with the death of the victim, Beeland ("Rosa") Te. The petitioner proceeded to jury trial at which the following evidence was adduced.

¶ 5        The victim, who was five feet tall and weighed 117 pounds, lived with her sister, Teodora Kwong, and her brother-in-law, Arthur Kwong. Due to a double mastectomy, she wore silicone gel implants in her bra. The victim ran a store at 1440 West 18th Street in Chicago where she sold candy, soda, small toys, and lottery tickets. The store consisted of a small lobby area and a back area separated by a partition. The partition had a door and a window through which people could talk and things could be passed. The door was normally locked unless the victim was setting up the toys for display in the morning.

¶ 6        On a trip to the Philippines, Teodora bought two matching medals of Saint Benedict, one of which she gave to the victim for protection. The victim kept her medal in the cash register at the store. She also kept small pencils in the store for customers to use to fill out the lottery slips.

¶ 7        Ruby Fontenot, who had been the petitioner's foster parent when the petitioner was a teenager testified that she lived two to three minutes away from the victim's store. The 22-year-old petitioner and the petitioner's toddler lived with Ruby. Three or four times a week, Ruby would stop at the victim's store to buy lottery tickets and talk to the victim.

¶ 8    On May 5, 1992, Ruby had a conversation with the victim about the petitioner. Upon returning home, Ruby asked the petitioner why she had borrowed money from the victim. The petitioner denied borrowing any money, but when Ruby insisted that she return what she had borrowed, the petitioner said she would get the money.

¶ 9    On May 6, 1992, Ruby asked the petitioner whether she had the money, and the petitioner responded that she would get some from her boyfriend. Ruby testified that when the petitioner returned to the house that night, she gave Ruby $40. Ruby put the money in her housecoat and went to bed.

¶ 10    On the following morning, Ruby checked her housecoat and found that the money was no longer there. When she returned from work as a crossing guard, Ruby asked the petitioner why she took the money from her housecoat. The petitioner initially denied taking the money but when Ruby insisted, the petitioner said she was going to the restaurant and would get it. The petitioner left Ruby's house with her child around 9:15 to 9:20 a.m. Later that day, Ruby found money with dried blood on the petitioner's dresser.

¶ 11    Patricia Rutledge next testified that she often babysat Ruby's grandchildren while Ruby was at work. On May 7, 1992, she arrived at Ruby's house at 7:30 a.m. to babysit. While there, Patricia saw the petitioner leaving with her daughter around 9:15 to 9:20 a.m. The petitioner returned to the house shortly before 10 a.m. Patricia saw that the petitioner had her right hand in her pocket and that her leg was cut. Patricia was concerned and called 911, while the petitioner went to her room. According to Patricia, the petitioner returned without her jacket and shoes. When the paramedics arrived, they took the petitioner to the hospital.

¶ 12    Patricia testified that when she returned to babysit for Ruby the following morning, she

3

decided to search the petitioner's room, at which point she found a bloody knife under the petitioner's mattress. Patricia showed the knife to Ruby, who recognized it as a knife that the petitioner had shown her three weeks ago.

¶ 13    Erma Gonzalez, who lived approximately two blocks from Ruby, next testified that on May 7, 1992, between 9 and 10 a.m., the petitioner rang her doorbell and told her that a Mexican man had tried to rob her and had stabbed her with a screwdriver. The petitioner did not ask Gonzalez to call the police or a doctor. Instead, she asked Gonzalez if she could enter her house and wash herself. Gonzalez refused to let the petitioner inside and told her that it would be better if she went home so Ruby could take her to the hospital.

¶ 14    Lenoir Sanchez, who lived next door to Ruby, testified that on the morning of May 8, 1992, the petitioner telephoned her from the hospital. The petitioner wanted to speak to Sanchez's boyfriend, who was the petitioner's boyfriend's brother. After calling a couple of times and being told Sanchez's boyfriend was not in, the petitioner asked Sanchez to go to Ruby's house and get something for her from under her mattress. Sanchez testified that she did not know what she was supposed to get from underneath the petitioner's mattress. When Sanchez went to Ruby's house, Rutledge would not let her inside.

¶ 15    Postal worker, Francis Diaz, next testified that at approximately 10 a.m., on May 7, 1992, he entered the victim's store and discovered her body. The victim had forty-two stab wounds and eight superficial cutting wounds.

¶ 16    The police were summoned and arrived soon thereafter. After a search of the scene they discovered that the cash register was open and contained no money. The back door was locked and the door that led from the lobby to the back room of the store showed no signs of forced entry. A bloody rag was discovered in the sink in the bathroom. It was later determined that the

blood on the rag matched the petitioner's blood. The police determined that the murder had occurred approximately an hour before they arrived.

¶ 17     Chicago Police Detective Shields testified that while canvasing the neighborhood on May 7, 1992, he spoke to Maricella Lopez, who informed him that she saw three to four suspicious looking African American and Hispanic males standing in front of the victim's store between 8:45 and 9:20 a.m. that morning. Nobody else that the detective spoke to had seen the individuals Lopez mentioned. After canvassing the neighborhood, Detective Shields went to the hospital and talked to the petitioner.

¶ 18     When, on the following morning, Detective Shields learned that a knife had been found in the petitioner's bedroom he went to the hospital to talk with the petitioner again. While there, the petitioner, who was dressed in a hospital gown, was released from the hospital. According to Detective Shields, the petitioner agreed to accompany him to the police station, and he carried her bag of clothing with him to the station. Inside the petitioner's bag, Detective Shields found a jacket with blood on it, a rag, and a T-shirt. The detective inventoried the evidence and sent it to the crime laboratory. Inside the petitioner's jacket, the police later discovered: $87 in one- and five-dollar bills, a medal of Saint Benedict, and a pencil. When Detective Shields asked the petitioner about the knife found under her bed, the petitioner told him she did not want to speak with him and left the police station.

¶ 19     On May 22, 1992, the police discovered that the blood on the knife found in the petitioner's bedroom was consistent with the victim's blood. The knife also contained traces of silicone from breast implants and fibers which matched the victim's clothing. A warrant was issued for the petitioner's arrest. Six days later the petitioner appeared at the police station with her attorney and she was arrested.

¶ 20    At trial, the petitioner testified that the knife belonged to Ruby's son-in-law Salvador Martinez and that he stabbed and killed the victim. She testified that at approximately 9:20 a.m. on May 7, 1992, she and her daughter arrived at the victim's store and saw the door in the partition open. When the petitioner peeked behind the partition, she saw Martinez repeatedly stabbing the victim. The petitioner told Martinez to stop, but he knocked her down, stabbed her in her right calf, threatened her and left the store. The petitioner averred that she pulled the knife out of her leg, put it in her sweatshirt pocket and left the store.

¶ 21    The petitioner admitted that when she knocked on Gonzalez's door on her way home, she told Gonzalez that she was stabbed with a screwdriver and not a knife. She explained, however, that at that time she did not know whether the object in her pocket was a screwdriver or a knife. The petitioner returned to Ruby's home, took off her sweatshirt and left it in her bedroom. She denied taking the object out of her sweatshirt or putting it under her mattress.

¶ 22    The petitioner told Ruby, Rutledge, and the police that a Hispanic man had stabbed her with a knife on the corner of 17th and Laflin Streets. She described Martinez but did not tell them that she knew him. The petitioner then went to the hospital where her leg was treated. From there, she tried calling her boyfriend's brother about six times to request that he get her insurance card from Ruby's house. The petitioner averred that she tried calling Ruby's house as well, but that nobody there would talk to her. The petitioner further testified that she agreed to go with the police to the station. There, she was shown a photocopy of the knife and asked if she recognized it. The petitioner testified that even though she told the police she did not want to speak with them and instead requested her attorney, the police nevertheless interrogated her for hours afterwards. A friend picked the petitioner up from the station, whereupon she went to Ruby's house, packed her belongings, and left.

¶ 23    Based on the aforementioned evidence, the jury found the petitioner guilty of murder and armed robbery.

¶ 24    The parties proceeded with sentencing. The petitioner's pre-sentence investigation report (PSI) was introduced into evidence. It revealed that the petitioner's criminal history consisted of a single juvenile delinquency adjudication for unlawful use of weapons, for which she received—and successfully completed—supervision. The PSI also disclosed, without elaboration, that the petitioner's father had been "physically abusive with [her] until she was 12 years old," and that she had never been treated by a mental health professional.

¶ 25    At the sentencing hearing, the State sought the death penalty, and the trial court found that the State had proven that the petitioner was eligible because she had personally killed the victim during the commission of an armed robbery. *See* Ill. Rev. Stat. 1991, ch. 38, ¶ 9–1(b)(6). In aggravation, the State then presented victim impact statements from the victim's sister and brother-in-law.

¶ 26    In mitigation, the defense called the petitioner and her father. Among other things, the petitioner's father testified that Catholic Charities removed the petitioner and her siblings from his care in 1985 because he had a drinking problem. The petitioner likewise testified that, after spending a year or two in foster care, she was taken from her father permanently in 1985 because of his drinking. She also testified that she had two children and that, while she was being held in jail pending trial, she attended parenting and computer programming classes and worked various jobs inside the facility before becoming pregnant. Neither the petitioner, nor her father testified about any physical abuse.

¶ 27    Before imposing sentence, the trial court indicated that it had considered all factors in

aggravation and mitigation, each side's arguments, the evidence presented during the hearing, the PSI, and its notes from the trial. The court then found that mitigating factors precluded a death sentence, and instead imposed a sentence of natural life imprisonment. *See* Ill. Rev. Stat. 1991, ch. 38, ¶ 1005–8–1(a)(1)(b) (West) (permitting, but not requiring, a trial court to impose life without parole if death-eligibility factor is found).

¶ 28    On direct appeal the petitioner argued that: (1) the State improperly used her silence at trial; (2) she was denied effective assistance of trial counsel; (3) the State failed to establish a sufficient chain of custody for items admitted into evidence; (4) the State exaggerated the evidence, shifted the burden of proof and made inflammatory comments in closing argument; and (5) the trial court failed to properly consider her background and rehabilitative potential when it sentenced her to natural life in prison. *People v. Ouska*, No. 1-95-0203 (March 24, 1997) (unpublished order pursuant to Supreme Court Rule 23). On March 4, 1997, this Court affirmed the petitioner's conviction and sentence. The petitioner sought leave to appeal to the Illinois Supreme Court, but leave was denied on June 4, 1997. *People v. Ouska*, 173 Ill. 2d 539 (1997).

¶ 29    On December 2, 1997, the petitioner filed a *pro se* postconviction petition. That petition was summarily dismissed on December 15, 1997. On September 14, 1998, we affirmed the summary dismissal of that petition pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). See *People v. Ouska*, No. 1-98-0365 (September 14, 1998) (unpublished order pursuant to Supreme Court Rule 23).

¶ 30    On November 14, 2017, the petitioner filed a *pro se* petition for *habeas corpus* relief (735 ILCS 5/10-102 *et seq*. (West 2016)) contending that her conviction and sentence were unconstitutional because they were based, in part, on a predicate offense that was found unconstitutional pursuant to *People v. Burns*, 2015 IL 117387. On January 24, 2018, the United

States District Court for the Northern District of Illinois dismissed that petition for writ of *habeas corpus*. See *U.S. ex rel. Ouska v. Washington*, 1999 WL 199557.

¶ 31    On December 14, 2017, the petitioner filed the instant *pro se* petition for relief from judgment pursuant to the new amendment in 2-1401(b-5) of the Code (735 ILCS 5/2-1401(b-5) (West 2016)), which permits a meritorious claim where evidence that the petitioner was a victim of intimate-partner domestic abuse is withheld from the trial court and not considered in mitigation.[1]  Therein, she asserted that: (1) she was convicted of a forcible felony; (2) her participation in the offense was related to her having been a victim of domestic abuse by an intimate partner; (3) no evidence of such domestic violence against her was presented at the sentencing hearing; (4) she was unaware of the mitigating nature of the domestic abuse evidence at the time of the sentencing hearing and could not have learned of it through diligence; and (5) this new evidence of domestic violence is material, non-cumulative, and of such a conclusive nature that it would change the sentence imposed.  In support, the petitioner attached an affidavit attesting that she had been physically, mentally, and sexually abused by her father, her brother,

---

[1] Section 2-1401(b-5) was added to the Code of Civil Procedure by Public Act 99–384, § 10 (eff. Jan. 1, 2016) (adding subsection (b-5) to 735 ILCS 5/2-1401).  It provides in pertinent part:
"(b-5) A movant may present a meritorious claim under this Section if the allegations in the petition establish each of the following by a preponderance of the evidence:
          (1) the movant was convicted of a forcible felony;
          (2) the movant's participation in the offense was related to him or her previously having been a victim of domestic violence as perpetrated by an intimate partner;
          (3) no evidence of domestic violence against the movant was presented at the movant's sentencing hearing;
          (4) the movant was unaware of the mitigating nature of the evidence of the domestic violence at the time of sentencing and could not have learned of its significance sooner through diligence; and
          (5) the new evidence of domestic violence against the movant is material and noncumulative to other evidence offered at the sentencing hearing, and is of such a conclusive character that it would likely change the sentence imposed by the original trial court
          Nothing in this subsection (b-5) shall prevent a movant from applying for any other relief under this Section or any other law otherwise available to him or her."

9

and her stepbrother, as well as by adults she had been fostered with through DCFS. She also alleged that she had been "[a]bused by male partners."

¶ 32    In February 2018, while her petition was pending before the trial court, the petitioner filed a *pro se* motion to amend her petition, alleging that she learned from a mental health counselor that, at the time of the murder, she was suffering from posttraumatic stress disorder, for which she was now seeking treatment. The motion to amend contended that this condition, as well as a history of anxiety and depression, constituted "serious mental illness," a statutory factor in mitigation under the recent amendment to the Uniform Code of Corrections.[2]

¶ 33    On February 23, 2018, the trial court, entered a written order *sua sponte* dismissing the original petition, without permitting any amendments. The trial court provided three reasons for its ruling. First, the trial court found that the petition was untimely because it had been filed more than two years after the petitioner's sentencing hearing. *See* 735 ILCS 5/2-1401(c) (West 2019). Second, the court found that any evidence that the petitioner had been a victim of domestic violence could not have been considered as a mitigating factor at her original sentencing hearing because her offense had taken place before January 1, 2016, the effective date of the new statutory provisions requiring a defendant's history of being a victim of domestic violence to be considered as a factor in mitigation in sentencing. *See* Public Act 99–384, § 5 (adding subsection (a)(15) to 730 ILCS 5/5-5-3.1(a)(15)).[3] Finally, the trial court found that the

---

[2] Section (a)(16) was added to the Uniform Code of Corrections by Public Act 99-877, § 5 (eff. Aug 22, 2016) (adding new subsection (a)(16) to 730 ILCS 5/5-5-3.1 (West 2016)). It created the following new mitigating factor: "At the time of the offense, the defendant was suffering from a serious mental illness which, though insufficient toe stablish a defense of insanity, substantially affected his or her ability to understand the nature of his or her act or to conform his or her conduct to the requirements of the law."

[3] Section (a)(15) was added to the Uniform Code of Corrections by Public Act 99–384, § 5 (adding subsection (a)(15) to 730 ILCS 5/5-5-3.1(a)(15)). It created the following new mitigating factor: "At the time of the offense, the defendant is or had been the victim of domestic violence and the effects of the domestic violence tended to excuse or justify the defendant's criminal conduct. As used in this paragraph

petitioner was not entitled to relief because she was not alleging that her sentence was void. The petitioner now appeals.

¶ 34                                            II.  ANALYSIS

¶ 35        At the outset, we set forth the well-established principles regarding petitions for relief from judgment.  Section 2-1401 of the Code provides a comprehensive statutory procedure by which final orders, judgments, and decrees may be vacated or modified in civil or criminal proceedings 30 days from their entry.  *People v. Dodds*, 2014 IL App (1st) 122268, ¶ 17; see also *In re Dar. C.*, 2011 IL 111083, ¶ 104; *People v. Vincent*, 226 Ill. 2d 1, 7 (2007); *Warren County Soil and Water Conservation Dist. v. Walters*, 2015 IL 117783, ¶ 31.  While section 2-1401 petitions are ordinarily used to bring facts to the attention of the trial court which, if known at the time of judgment, would have precluded its entry, they may also be used to challenge a purportedly defective judgement for legal reasons.  *Warren County Soil*, 2015 IL 117783, ¶ 31.

¶ 36        To be entitled to relief under section 2-1401, a defendant must prove by a preponderance of the evidence: (1) the existence of a meritorious defense or claim; (2) due diligence in presenting this defense or claim to the circuit court in the original action; and (3) due diligence in filing the section 2-1401 petition for relief.  *Dodds*, 2014 IL App (1st) 122268, ¶ 18; *People v. Pinkonsly*, 207 Ill. 2d 555, 566 (2003); see also *Vincent*, 226 Ill. 2d at 7–8.

¶ 37        It is well-established that a trial court may *sua sponte* dismiss a section 2-1401 petition. *People v. Vincent*, 226 Ill. 2d 1, 9-10 (2007). The rationale is that proceedings under section 2-1401 are subject to the usual rules of civil practice, and that accordingly such petitions are "subject to dismissal for want of legal or factual sufficiency." *Id*. at 8. Furthermore, "responsive

---

(15), 'domestic violence' means abuse as defined in Section 103 of the Illinois Domestic Violence Act of 1986."

11

pleadings are no more required in section 2-1401 proceedings than they are in any other civil action." *Id*. at 9. As in civil proceedings on complaints, a respondent's failure to answer the section 2-1401 petition "constitutes an admission of all well-pleaded facts" and renders the petition ripe for adjudication on the pleadings alone. *Id*. at 9-10. Our supreme court has equated a judgment on the pleadings in the context of petitions for relief from judgment with a dismissal for failure to state a cause of action. *Id*. at 14. Accordingly, our supreme court has held that a trial court may dispose of a section 2-1401 petition without waiting for the State's responsive pleading or providing notice of the impending ruling to the petitioner, where it is clear on the face of the petition that the "requesting party is not entitled to relief as a matter of law." See *Id.* at 12. Our review of any such *sua sponte* dismissal of a petition for relief from judgment is *de novo*. *People v. Morfin*, 2012 IL App (1st) 103568, ¶ 30.

¶ 38     In the present case, on appeal, the petitioner first contends that the trial court erred when it *sua sponte* dismissed her petition on the basis that it was untimely. Ordinarily, a section 2-1401 petition must be filed within two years after entry of the judgment being challenged, unless the opposing party waives the limitations period. 735 ILCS 5/2-1401(a), (c) (West 2018); see also *Dodds*, 2014 IL App (1st) 122268, ¶ 19; *Vincent*, 226 Ill. 2d at 7. An exception to this two-year limitation period exists where a clear showing has been made that: (1) the person seeking relief was under legal disability or duress; or (2) the grounds for relief were fraudulently concealed, or where the petition challenges the judgment as void. See *Dodds*, 2014 IL App (1st) 122268, ¶ 19. The allegation "that the judgment or order is void substitutes for and negates the need to allege a meritorious defense and due diligence." (Internal quotation marks omitted.) *People v. Walters*, 2015 IL 117783, ¶ 48.

¶ 39     In the present case, the State argues that dismissal was proper where the petition was filed

well over two years after the entry of the challenged judgment, and where that judgment was not void. The petitioner, on the other hand, contends that even though a trial court may *sua sponte* dismiss a petition for relief from judgment, because timeliness is an affirmative defense, it may not do so on the basis of timeliness where the State fails to argue timeliness before the trial court. The petitioner contends that because the State here never filed a response to her petition challenging its timeliness (including arguing that the voidness exception to the ordinary two-year deadline did not apply), the trial court had no authority to dismiss her petition as untimely. For the reasons that follow, we agree.

¶ 40    In *People v. Cathey*, 2019 IL App (1st) 153118, ¶ 18, this court recently held that a "trial court may not "*sua sponte* dismiss a section 2-1401 petition based on untimeliness if that issue was never raised before the [trial] court." In coming to this conclusion, we relied on the decision of our supreme court in *People v. Pinkonsly*, 207 Ill. 2d 555, 562-63 (2003). In that case, our supreme court held that timeliness under section 2-1401 is an affirmative defense that a responding party may waive or forfeit by failing to raise the issue before the trial court. *Id*. at 562-63. In *Pinkonsly* , our supreme court was asked to determine whether the State could raise the timeliness of a defendant's section 2-1401 petition for the first time on appeal. To resolve the issue, our supreme court looked to its prior precedent in *People v. Wright*, 189 Ill. 2d 1 (1999), in which it considered this same issue in the context of a first stage postconviction proceeding (725 ILCS 5/122-1 *et seq.* (West 1994)). The court in *Pinkonsly* noted that it had previously held that the limitations period in the relevant section of the Postconviction Hearing Act allowed for exceptions if the late filing of a postconviction petition was not due to the defendant's culpable negligence. *Pinkonsly*, 207 Ill. 2d at 563-64. As the supreme court in *Pinkonsly* explained, although a defendant is required under the Postconviction Hearing Act to

allege facts demonstrating a lack of culpable negligence, the State is not permitted " 'to wait until an appeal to raise an affirmative defense that the defendant may be able to avoid by amending his petition.' " *Id.* at 563 (quoting *Wright*, 189 Ill. 2d at 11). The court reasoned that by not raising the timeliness issue below, " 'the State ha[d] effectively precluded defendant from seeking to amend his petition to allege facts demonstrating that the late filing was not caused by his culpable negligence.' " *Id.* (quoting *Wright*, 189 Ill. 2d at 11).

¶ 41    Comparing section 2-1401 of the Code to section 122-1 of the Postconviction Hearing Act, the court in *Pinkonsly* noted that the Code likewise provided for an exception to its limitations period for delays attributable to disability, duress, or fraudulent concealment. See 735 ILCS 5/2-1401(c) (West 2014). The court therefore concluded "that [its] statement in *Wright* applie[d] with equal force" in the context of a section 2-1401 petition, and held that a State waives its timeliness argument when it fails to raise the issue "before the trial court, where any amendments could have been made and any factual disputes could have been resolved." *Pinkonsly*, 207 Ill. 2d at 564.

¶ 42    Applying the rationale of *Pinkonsly*, in *Cathey*, this appellate court held that *sua sponte* dismissal of a section 2-1401 petition is improper where the issue is not raised by the parties below, and the petitioner is presented with no opportunity to avoid dismissal by amending her petition to allege supporting facts. *Cathey*, 2019 IL App (1st) 153118, ¶ 18. As we explained:

    "When the State does not answer a petition, its failure to respond constitutes an admission of all well-pleaded facts and that no triable issue of fact exists. Thus, the trial court can *sua sponte* dismiss a section 2-1401 petition where the only issue before the court is whether defendant is entitled to relief as a matter of law. Application of the limitations period, however, requires a court to make fact determinations because exceptions are allowed

for delays attributable to disability, duress, or fraudulent concealment. [Citations.] Furthermore, where the State forfeits the timeliness defense by not answering the petition, defendant has no opportunity to amend his petition to allege facts showing a potential factual dispute. In this context, dismissal of defendant's petition on the pleadings as a matter of law would be improper." *Id*.

¶ 43    We agree with the rationale of *Cathey*. Applying its holding to the facts of this case, we find that the trial court erred when it *sua sponte* dismissed the petition as untimely. See *Id*.; see also *People v. Berrios*, 387 Ill. App. 3d 1061, 1063 (2009) ("the two-year period contained in section 2-1401 is a statute of limitation and not a jurisdiction prerequisite. [Citation] As such, the State must assert the time limitation as an affirmative defense; the trial court may not, *sua sponte,* dismiss the petition on the basis of timeliness"); *People v. Malloy*, 374 Ill. App. 3d 820, 823 (2007) ("If the trial court dismisses a petition for relief from judgment, on its own motion, on the basis of timeliness, that dismissal is erroneous.").

¶ 44    In coming to this conclusion, we reject the State's position that *Cathey* was "incorrectly decided," and find its reliance on *People v. Laugharn*, 233 Ill. 2d 318 (2009) and *People v. Thompson*, 2015 IL 118151, ¶ 15, misplaced. Contrary to the State's assertion, *Laugharn*, nowhere held that trial courts may dismiss section 2-1401 petitions *sua sponte* based on the statute of limitations. Instead, the court in *Laugharn* dealt with the issue of ripeness and held that trial courts may not dispose of section 2-1401 petitions *sua sponte* "before the conclusion of the usual 30-day period to answer or otherwise plead" by the State. *People v. Laugharn*, 233 Ill. 2d 318, 323 (2009). This is not the issue in this appeal.

¶ 45    *Thompson* is similarly distinguishable. In that case, unlike here, the State actually moved to

15

dismiss the petition as untimely. *People v. Thompson*, 2015 IL 118151, ¶ 15. Moreover, *Thompson* nowhere held that the trial court may *sua sponte* dismiss a petition on the basis of the statute of limitations. In fact, on this issue, *Thompson* cited to *Pinkonsly* favorably. See *Thompson*, 2015 IL 118151, ¶ 29 ("When a petition is filed after the two-year limitations period and there is no basis to excuse the delay, the petition cannot be considered unless the limitations period is waived by the opposing party.") (citing *Pinkonsly*, 207 Ill. 2d at 562).

¶ 46    Having found that dismissal based on timeliness was premature, we turn to the merits of the petitioner' claim. The petitioner contends that her petition sufficiently alleged all five elements of a meritorious claim pursuant to section 2-1401(b-5) of the Code (735 ILCS 5/2-1401(b-5) (West 2016)), where she alleged that: (1) she was convicted of a forcible felony; (2) her participation in the offense was related to her being a victim of domestic violence by an intimate partner; (3) no evidence of domestic violence was presented at her original sentencing hearing; (4) she was unaware of the mitigating nature of the domestic violence and could not have learned of its significance sooner through due diligence; and (5) the new evidence is material, noncumulative, and so conclusive that it likely would have changed the sentence imposed. The petitioner contends that because at the pleading stage the trial court was required to consider all her well-pleaded allegations and affidavit as true, dismissal of her section 2-1401(b-5) claim was improper.

¶ 47    In response, the State does not dispute that the petition adequately alleged all five elements of a section 2-1401(b-5) claim (735 ILCS 5/2-1401(b-5) (West 2016)). Rather, the State argues that dismissal was proper because sections 2-1401(b-5) of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401(b-5) (West 2016)) and 5-5-3.1(a)(15) of the Unified Code of Corrections (UCC)

(730 ILCS 5/5-5-3.1(a)(15) (West 2016)) upon which the petition is premised do not apply retroactively. For the reasons that follow, we disagree.

¶ 48     As shall be more fully explained below, contrary to the State's assertion, the petitioner's claim does not require the retroactive application of any law.

¶ 49     In this regard, at the outset, we find illogical the State's argument regarding the retroactivity of section 2-1401(b-5) of the Code. Section 2-1401(b-5) became effective on January 1, 2016. See Public Act 99–384, § 10 (eff. Jan. 1, 2016) (adding subsection (b-5) to 735 ILCS 5/2–1401). The petitioner filed her section 2-1401(b-5) petition on December 14, 2017, nearly a year after that amendment took effect, so that the amendment was in full force at the time the petition was filed. It is well-established that the applicable provision of any statute is the one in effect at the time the pleading is filed. See *People v. Harris,* 224 Ill. 2d 115, 125 n. 1 (2007) (the applicable provision of the Postconviction Hearing Act is the one in effect at the time the pleading is filed) Since "[a] section 2-1401 petition, although filed in the same proceeding, is the commencement of a new cause of action and is not a continuation of the proceeding in which the prior judgment was entered," the applicable provision of the Code at the time of the petition's filing undoubtedly would have included section 2-1401(b-5). Public Act 99–384, § 10 (eff. Jan. 1, 2016) (adding subsection (b-5) to 735 ILCS 5/2–1401). As such, we do not comprehend how retroactivity of section 2-140(b-5) even comes into play. *Village of Island Lake v. Parkway Bank and Trust Co.*, 212 Ill. App. 3d 115, 120 (1991); see *People v. Kane*, 2013 IL App (2d) 1105945, ¶ 13 (same).

¶ 50     Moreover, if the petitioner succeeds on her section 2-1401(b-5) claim and obtains relief, she will necessarily proceed to a new sentencing hearing, at which the trial court will be bound to consider domestic abuse as a statutory mitigating factor under the new amendments to section 5-5-3.1 of the UCC (730 ILCS 5/5-5-3.1(a)(15) (West 2016)). Because any such resentencing

hearing will necessarily take place after January 1, 2016, the effective date of that amendment, we again fail to see how retroactivity of section 5-5-3.1 of the UCC is implicated. See Public Act 99–384, § 5 (eff. Jan. 1, 2016) (adding section 5-5-3.1(a)(15) to 730 ILCS 5/5-5-3.1(1)(15)).

¶ 51 The State appears to argue that retroactivity comes into play because the petitioner's claim relates to events and acts that predate the enactment of section 2-1401(b-5) of the Code. However, this does not equate to her seeking retroactive application of any law. *See White v. Sunrise Healthcare Corp.*, 295 Ill. App. 3d 296, 299 (1998). Our supreme court has repeatedly explained that "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment or upsets expectations based in prior law." *Hayashi v. Illinois Dep't of Fin. & Prof. Regulation*, 2014 IL 116023, ¶ 25 (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 (1994)). For a law to have retroactive impact, it must "reach back in time" in a way that does not merely alter a party's rights or liabilities going forward but actually changes the legal significance of those actions *at the time they were performed*. *See Hayashi*, 2014 IL 116023, ¶ 26.

¶ 52 In the present case, section 2-140(b-5) provides relief against sentences imposed before its enactment, but it does not retroactively impair the legality of those sentences.

¶ 53 Our supreme court's decision in *Hayashi* is illustrative of the difference. In that case, the plaintiffs—a chiropractor and two medical doctors—had their professional licenses revoked as a consequence of a new law that rendered them ineligible to practice medicine due to their prior criminal convictions. *Id.* ¶¶ 5–9. Even though the law altered the plaintiffs' legal rights based on events that predated its enactment, our supreme court rejected the argument that it had a retroactive effect. *Id.* ¶ 25. It explained that the new law was only being applied prospectively,

not retroactively, because it had "no effect on [the] plaintiffs' right to practice their health care professions prior to *** [its] effective date." *Id.* ¶ 26.

¶ 54    Here, the petitioner is not seeking to apply new rules of law to retrospectively attack the legality of her sentence at the time it was imposed. She is merely pursuing a new form of sentencing relief that is available under certain circumstances to victims of intimate-partner domestic violence under section 2-1401(b-5) of the Code (735 ILCS 5/2-1401(b-5) (West 2016)). Hence, retroactivity is not implicated.

¶ 55    The State's argument to the contrary rests on a fundamental misunderstanding of section 2-1401(b-5) as a "procedural vehicle" for "a claim under section 5-5-3.1(a)(15)" of the UCC. In other words, the State contends that a section 2-1401(b-5) claim is merely an allegation of *sentencing error* for failing to consider a statutory factor in mitigation that was enacted by section 5-5-3.1 of the UCC, 21 years after the petitioner was sentenced. Accordingly, the State's retroactivity argument proceeds from the assumption that her claim is an allegation of legal error at sentencing.

¶ 56    This assumption, however, is wrong. Section 2-1401(b-5) of the Code provides:

> "(b-5) A movant may present a meritorious claim under this Section if the allegations in the petition establish each of the following by a preponderance of the evidence:
>
> (1) the movant was convicted of a forcible felony;
>
> (2) the movant's participation in the offense was related to him or her previously having been a victim of domestic violence as perpetrated by an intimate partner;
>
> (3) no evidence of domestic violence against the movant was presented at the movant's sentencing hearing;

(4) the movant was unaware of the mitigating nature of the evidence of the domestic

violence at the time of sentencing and could not have learned of its significance sooner

through diligence; and

(5) the new evidence of domestic violence against the movant is material and

noncumulative to other evidence offered at the sentencing hearing, and is of such a

conclusive character that it would likely change the sentence imposed by the original trial

court." 735 ILCS 5/2-1401(b-5) (West 2016)

Section 2-1401(b-5) makes no mention of section 5-5-3.1(a)(15) of the UCC (730 ILCS 5/5-5-

3.1(a)(15) (West 2016)), nor does it require the petitioner to allege that the sentencing judge

committed a legal error by disregarding intimate-partner abuse as a *statutory* mitigating factor.

Rather, it only requires the petitioner to allege that the judge *was never given the chance* to

consider intimate-partner abuse evidence in the first place. *See* 735 ILCS 5/2-1401(b-5)(2), (3)

(West 2016).

¶ 57    By its plain terms, section 2-1401(b-5) evinces the legislature's intent that a sentence reflect

the mitigating nature of intimate-partner domestic abuse so that when it is not put forward at the

original sentencing hearing, it can justify holding a new one.  Section 2-1401(b-5) effectuates

that policy by setting forth the factual circumstances under which a defendant should receive a

new sentencing hearing.  Contrary to the State's position, legal error--whether under current law

or then existing law--is not one of those facts.

¶ 58    Under these circumstances, we are compelled to conclude that where the petitioner set forth

all five elements of a section 2-1401(b-5) claim and the State does not challenge the sufficiency

of her pleadings, dismissal on the merits was improper.

¶ 59                                    III.  CONCLUSION

¶ 60      For the aforementioned reasons, we find that the trial court erred when it *sua sponte* dismissed the petition for relief from judgment. We therefore reverse and remand for further proceedings.

¶ 61      Reversed and remanded.